# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### JUNE 1998 SESSION



**FILED**

**August 10, 1998**

**Cecil Crowson, Jr.**
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **NO. 02C01-9711-CC-00424** |
| Appellee, | ) | |
| | ) | **MCNAIRY COUNTY** |
| **VS.** | ) | |
| | ) | **HON. JON KERRY BLACKWOOD,** |
| **DON EDWARD CARTER,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (First Degree Murder) |

**FOR THE APPELLANT:**

**GARY F. ANTRICAN (At Trial)**
District Public Defender

**JEANIE A. KAESS (At Trial)**
Assistant Public Defender
118 East Market Street
P.O. Box 700
Somerville, TN 38068

**C. MICHAEL ROBBINS (On Appeal)**
3074 East Street
Memphis, TN 38128

**FOR THE APPELLEE:**

**JOHN KNOX WALKUP**
Attorney General and Reporter

**MARVIN E. CLEMENTS, JR.**
Assistant Attorney General
Cordell Hull Building, 2nd Floor
425 Fifth Avenue North
Nashville, TN 37243-0493

**ELIZABETH T. RICE**
District Attorney General

**ED NEAL McDANIEL**
Assistant District Attorney General
300 Industrial Park Drive
P.O. Box 473
Selmer, TN 38375-0473

**OPINION FILED:** _____

**AFFIRMED**

**JOE G. RILEY,**
**JUDGE**

**OPINION**

The defendant, Don Edward Carter, was convicted by a McNairy County jury of two (2) counts of premeditated first degree murder. He received concurrent sentences of life imprisonment. On appeal, he claims that (1) the evidence was insufficient to sustain his convictions for first degree murder, and (2) the trial court erred in failing to suppress his confession at trial. After a thorough review of the record before this Court, we find no reversible error. Accordingly, the judgment of the trial court is affirmed.

**FACTS**

On January 28, 1996, the bodies of Audie and Nellie Carter were found in their home. Both victims had been shot in the neck while lying in bed. Law enforcement authorities were summoned, and although they found no evidence of forced entry into the home, the telephone wires had been severed. According to the medical examiner, the victims were killed before midnight the previous day. The murder weapon was not located; however, testimony at trial revealed that the victims' wounds were consistent with having been inflicted by a high-powered rifle. The bullets recovered from the scene were shot from the same gun and identified as Winchester 30/30 bullets. The gun belonged to the victim, Audie Carter. Defendant's fingerprints were found on two boxes of Winchester 30/30 ammunition in the victims' home.

The victims were defendant's father and his aunt.[1] On January 27, defendant spent the day with his brother, Randy, and they spent the evening with their cousin, Tommy Carter, and his wife, Rhonda. At approximately 7:30 p.m., defendant left Tommy's house to return a skill saw to his father's home. When

_____

[1] Nellie Carter was previously married to defendant's uncle, Audie's brother. Although Audie and Nellie were living together, the couple was not legally married at the time of their deaths.

defendant returned one hour later, he told Randy that "they [are] gone."[2]  The next day, January 28, defendant told his brother on two (2) separate occasions that he had shot Audie and Nellie Carter.  He also told Randy that he disposed of the gun, Nellie's purse and Audie's wallet.

On January 30, defendant was receiving medical treatment at McNairy County General Hospital.  While he was there, he spoke with a "crisis counselor" who was called in to assess defendant's mental condition.  During their conversation, defendant stated that he could not sleep because he had a "mental picture" of what he saw Saturday night that he would never forget.[3]

Defendant spoke with the police on several occasions and gave two written statements.  In his first statement taken on March 11, defendant denied any involvement in the shootings of Audie and Nellie Carter.  However, in the second statement taken on March 27, defendant confessed to killing Audie and Nellie.  He stated that he went to his father's home and made a phone call.  He left, but returned a short time later.  He walked around to the back of the house and cut the telephone wires.  He used his key to gain entry into the home[4] and walked into the bedroom.  He picked up a Winchester 30/30 rifle that his father kept beside the bed and shot his father and Nellie.  He then took the gun, his father's wallet and Nellie's purse and returned to Tommy and Rhonda's house.  He subsequently disposed of the gun, wallet and purse in the Tennessee River.  Defendant concluded this statement with, "I'm sorry for what happened.  I wish I could make things right."

At trial, defendant testified on his own behalf.  He recanted his confession and denied any involvement in the shootings.  He testified that he went to his father's home around 8:00 p.m., made a phone call and returned to Tommy's house.  He stated that he did not leave Tommy's house again that night.  He

_____

[2] When questioned about this, Randy initially testified that he did not remember what, if anything, defendant told him when defendant returned from his father's house. However, the prosecution refreshed his memory with his statement to law enforcement authorities. Randy eventually implicitly conceded that defendant said, "they [are] gone." We, therefore, will consider this statement substantively.

[3] According to the medical examiner, the victims were killed sometime prior to midnight on Saturday, January 27.

[4] Defendant had previously lived with his father and Nellie.

3

testified that although he lived with Audie and Nellie previously, he did not have a key to his father's home at the time of the shootings. He stated that he confessed to the murders because the police were putting pressure on him to make a statement and in hopes that the police would drop criminal charges against his brother.[5]

The jury returned guilty verdicts on both counts of premeditated first degree murder. Defendant now brings this appeal as of right pursuant to Tenn. R. App. P. 3.

## SUFFICIENCY OF THE EVIDENCE

Defendant claims that the evidence is insufficient to support the jury's finding of guilt for first degree murder. Specifically he argues that there is insufficient evidence of premeditation. Further, because all homicides are presumed to be second degree murder in the absence of proof of premeditation, defendant contends that the evidence would merely support convictions for second degree murder.

### A. Standard of Review

In Tennessee, great weight is given to the result reached by the jury in a criminal trial. A jury verdict accredits the state's witnesses and resolves all conflicts in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. Id.; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Moreover, a guilty verdict removes the presumption of innocence which the appellant enjoyed at trial and raises a presumption of guilt on appeal. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The appellant has the burden of overcoming this presumption of guilt. Id.

Where sufficiency of the evidence is challenged, the relevant question for an

---

[5] At that time, Randy was charged with accessory after the fact to first degree murder.

4

appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

### B. Elements of Offense

All homicides are presumed to be murder in the second degree. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992); State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The state bears the burden to prove premeditation in order to elevate the offense to murder in the first degree. Id.

At the time the offenses were committed, first degree murder was defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1995).[6] A premeditated act is one "done after the exercise of reflection and judgment" and requires a previously formed design or intent to kill. Tenn. Code Ann. § 39-13-202(d) (Supp. 1995); State v. West, 844 S.W.2d at 147.

The element of premeditation may be established by the circumstances surrounding the offense. State v. Bordis, 905 S.W.2d 214, 221 (Tenn. Crim. App. 1995); State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Indeed, in State v. Brown, *supra*, our Supreme Court recognized:

> there may be legitimate first-degree murder cases in which there is no direct evidence of the perpetrator's state of mind. Since that state of mind is crucial to the establishment of the elements of the offense, the cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence. Relevant circumstances recognized by other courts around the country have included the fact "that a deadly weapon was used upon an unarmed victim; that the homicidal act was part of a conspiracy to kill persons of a particular class; that the killing was particularly cruel; that weapons with which to commit the homicide were procured; that the defendant made declarations of his intent to kill the victim; or that preparations were made before the homicide for concealment of the

---

[6] Prior to 1995, first degree murder was defined as the "intentional, premeditated and deliberated killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1991).

5

crime, as by the digging of a grave."

836 S.W.2d at 541-42 (quoting C. Torcia, *Wharton's Criminal Law* § 140 (14th ed. 1979).

### C. Presence of Premeditation

In the present case, defendant's statement reveals that he returned to his father's home on the night of January 27. He walked around the back of the house and severed the telephone wires. He used his key to gain entry into the home and walked into his father's bedroom. He then picked up a rifle and, without provocation, shot Audie and Nellie Carter while they were lying in bed. He then took his father's wallet and Nellie's purse and left the house. He eventually disposed of the murder weapon.

We conclude that there is sufficient evidence of premeditation in this case. By his own statement, defendant admits cutting the telephone wires prior to entering the house. He picked up a weapon and shot his father and aunt as they lay helpless in their bed. There is sufficient circumstantial evidence from which the jury could find that defendant had a "previously formed design or intent to kill." State v. West, 844 S.W.2d at 147.

This issue has no merit.

### MOTION TO SUPPRESS

Defendant contends the trial court erred in failing to suppress his confession. Firstly, defendant contends the confession was taken in violation of his right to counsel. Secondly, defendant contends the confession was the product of unlawful detention and an unnecessary delay in bringing him before a magistrate. We decline to suppress the confession.

### A. Facts

The victims were murdered on January 27, 1996. Defendant was interviewed by TBI Agent Terrill McLean on February 7, 1996. Defendant declined to give a statement until he "went to Lakeside [and] got everything straightened out."

6

Defendant was again interviewed on March 11 and, after being advised of his Miranda rights, denied any involvement in the murders.

On March 22 Robert Stacey contacted the law office of Steve Farese. Stacey was the employer of Rhonda Carter who was the wife of defendant's cousin. Stacey had previously used the professional services of Farese and asked Farese to speak with the defendant. Defendant called Farese and made an appointment to see Farese on Sunday, March 24 at 6 p.m.

Shortly after midnight on Sunday, March 24, Sheriff Paul Ervin spoke with Rhonda Carter. She testified that she advised the sheriff the defendant had told her that "before this got any farther - went any farther and anybody else got involved, that he would just go ahead and go and confess." The sheriff testified that she stated the defendant was going to get a commercial driver's license and was leaving the state. Although Carter denied that she stated the defendant was going to flee, she acknowledged that she might have advised the sheriff that the defendant intended to get a commercial driver's license. She further acknowledged that she talked to the sheriff about the defendant going into the Navy.

Based upon this information, Sheriff Ervin arrested the defendant without a warrant the same day the sheriff spoke with Rhonda Carter; namely, Sunday, March 24. Defendant was again advised of his Miranda rights, refused to make a statement and told Sheriff Ervin that he wanted to speak with an attorney before making a statement. In addition, the defendant advised Agent McLean that he did not desire to make a statement. The defendant was not interrogated on March 24. Since the defendant was arrested on March 24, he did not keep his appointment with Attorney Farese at 6:00 p.m. that day.

On the next day, Monday, March 25, Agent McLean obtained arrest warrants from the General Sessions Court of McNairy County charging defendant with the first degree murder of the two (2) victims. The affidavit portion of the warrants stated that the defendant killed the victims, and "this was a premeditated and intentional act and violation of T. C. A. 39-13-202." The defendant remained incarcerated.

7

From March 25 until March 27, the defendant did not give a statement although the sheriff concedes he may have asked the defendant if he wanted to make a statement.

From the time of his arrest on March 24 until March 27, defendant remained incarcerated. Defendant had previously been taking Prozac and Valium for depression prior to his arrest. Although the defendant stated he did not take this medication during these three (3) days, at the motion to suppress he stated he did not remember if the medication was actually refused him by the jail authorities. During this time defendant was allowed to visit with his mother and perhaps other family members even during hours that visitation was not normally allowed.

No restriction was placed upon the defendant as to the number of phone calls he could make. However, a phone block was utilized to prohibit calls to Rhonda Carter. This resulted from her conversation with the sheriff in which she stated, "God, when Pee Wee [defendant] hears of this, he's going to be very upset." As to whether she personally requested the block, she stated, "I don't think that I did." Sheriff Ervin testified that she requested the block.[7] A block was also placed on the phone to her employer, Robert Stacey. Sheriff Ervin had no recollection about a block on this phone. There is no proof indicating any kind of block on Attorney Farese's phone.

On Wednesday, March 27, at approximately 8:00 p.m. defendant advised the jailer that he wished to speak with Sheriff Ervin. Sheriff Ervin was notified and, along with Agent McLean, met with the defendant. The defendant was again advised of his Miranda rights and signed a written waiver at approximately 9:20 p.m. In a two-page statement the defendant admitted to shooting both victims with the 30/30 caliber rifle.

Defendant's initial appearance before the magistrate was the next day, Thursday, March 28.

### B. Right to Counsel

_____

[7]Although the sheriff's secretary did not testify at the suppression hearing, at trial she testified that Rhonda Carter called and asked that her phone be blocked from calls from the jail. Rhonda Carter did not testify at trial.

Defendant contends his confession was unconstitutionally taken in violation of his right to counsel. The state argues that, even though the defendant had earlier requested counsel, defendant initiated the conversation which led to his confession. We conclude there was no violation of the right to counsel.

**(1)**

The Sixth Amendment right to counsel attaches when the adversarial judicial process begins. Michigan v. Jackson, 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986). In Tennessee, the adversarial judicial process begins upon the filing of the formal charge, such as an arrest warrant, indictment, presentment, or preliminary hearing in cases where a warrant was not obtained prior to the arrest. State v. Stephenson, 878 S.W.2d 530, 547 (Tenn. 1994); State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980).

The Fifth Amendment right to counsel is triggered whenever a suspect requests that counsel be present during custodial interrogation. *See* Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966); State v. Stephenson, 878 S.W.2d at 544.

When a defendant clearly requests an attorney during custodial interrogation, all questioning must cease until an attorney is present, unless the defendant subsequently initiates further conversation with the authorities. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed. 2d 378 (1981). This same test is utilized under both the Fifth and Sixth Amendment right to counsel. Michigan v. Jackson, 475 U.S. at 636, 106 S.Ct. at 1411.

**(2)**

It appears that defendant's Fifth and Sixth Amendment rights to counsel were implicated. The defendant was arrested without a warrant on March 24; the arrest warrant issued March 25; the defendant had refused to make a statement without first consulting counsel; and the statement was taken on March 27. The state concedes that, had the confession been given after the invocation of the right to counsel and prior to defendant's initiating the conversation with authorities, the

confession would have been taken in violation of the constitution. *See* Edwards v. Arizona, *supra*; State v. Stephenson, *supra*. We agree.

However, the defendant initiated the conversation which led to his confession. At approximately 8:00 p.m. on March 27, defendant advised the jailer that he wished to speak with Sheriff Ervin. Upon the appearance of Sheriff Ervin and Agent McLean, the defendant gave his statement. The giving of the statement was preceded by Miranda rights, and the defendant waived his right to counsel in writing. Therefore, the confession was not taken in violation of his right to counsel under either the Fifth or Sixth Amendment.

This issue is without merit.

### C. Unlawful Detention

Defendant contends his confession was the product of an illegal arrest and unlawful detention in violation of the Fourth Amendment of the United States Constitution. The state, however, contends the initial warrantless arrest was made with probable cause and was properly followed by an arrest warrant the next day. We hold the defendant was properly in custody at the time he gave the statement.

### (1) Warrantless Arrest

An officer may, without a warrant, arrest a person when a felony has been committed, and the officer has reasonable cause to believe that the person arrested committed it. Tenn. Code Ann. § 40-7-103(a)(3); State v. Marshall, 870 S.W.2d 532, 538 (Tenn. Crim. App. 1993). Whether probable cause exists depends upon whether the facts and circumstances known to the officer were sufficient to warrant a prudent person to believe that the individual had committed the offense. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L. Ed. 2d 142 (1964); State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997).

Based on this authority we conclude the warrantless arrest of the defendant was with probable cause and, therefore, valid. In earlier conversations the defendant had denied any involvement in the offense. Authorities determined that defendant had made a telephone call from the victims' residence on the night of the homicides. The authorities were also aware of defendant's statement to his

10

counselor that he was unable to forget the mental picture of what he saw on the night of the homicides. Shortly after midnight on the date of the arrest, Sheriff Ervin was informed by Rhonda Carter that the defendant was going to confess to the homicides. Moreover, the sheriff also had a reasonable basis for believing the defendant might leave the state. Based upon all of this information, we conclude that probable cause existed for the warrantless arrest of the defendant.

### (2) Fourth Amendment Violation

Defendant next contends his detention was in violation of the holdings in Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed. 2d 54 (1975), and County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed. 2d 49 (1991). Defendant's reliance upon these cases is misplaced.

In Gerstein the United States Supreme Court determined that the Fourth Amendment required a prompt judicial determination of probable cause after a warrantless arrest. Gerstein, 420 U.S. at 125, 95 S.Ct. at 868-69. McLaughlin clarified its Gerstein holding by stating that judicial determinations of probable cause are generally to be made within 48 hours of the arrest. McLaughlin, 500 U.S. at 56, 111 S.Ct. at 1670.

The defendant in the case *sub judice* was not being held pursuant to a warrantless arrest at the time of his confession. He was properly arrested upon probable cause without a warrant on Sunday, March 24. An arrest warrant was

secured the next business day; namely, Monday, March 25. The confession was given on Wednesday, March 27. Since the defendant was being held pursuant to the arrest warrant at the time of the confession, there is no Fourth Amendment violation.

### (3) Rule 5(a) Violation

We are next confronted with the issue of whether the defendant's confession was taken in violation of Tenn. R. Crim. P. 5(a) since he was not taken before a magistrate "without unnecessary delay." Although we conclude the defendant's confession was taken in violation of Rule 5(a), the statement was voluntarily given

11

under the totality of the circumstances and, therefore, should not be suppressed.

**(a)**

Tenn. R. Crim. P. 5(a) not only provides that a person arrested without a warrant be taken before a magistrate without unnecessary delay as also required by Gerstein and McLaughlin, but also "[a]ny person arrested except upon a capias pursuant to an indictment or presentment shall be taken without unnecessary delay before the nearest appropriate magistrate of the county from which the warrant for arrest issued. . ." Thus, those arrested with a warrant must be taken before a magistrate without unnecessary delay.

In this case the defendant was arrested without a warrant on Sunday, March 24. Although the defendant was not taken before the magistrate, an arrest warrant was secured from the General Sessions Court on Monday, March 25. The defendant was not taken before a magistrate prior to his confession on Wednesday, March 27. The defendant was taken before a magistrate on Thursday, March 28.

The state has advanced no reason for the delay in taking the defendant before the magistrate as required by Tenn. R. Crim. P. 5(a). This could have been done on March 25, 26 or 27 prior to the confession. Under all the facts and circumstances, we conclude the failure to take the defendant before a magistrate at some time in these three (3) business days was an unnecessary delay within the meaning of Rule 5(a).

**(b)**

Having found a 5(a) violation, we must now determine whether the confession should have been excluded from evidence. A violation of Rule 5(a) does not necessarily lead to the suppression of the confession. *See* State v. Middlebrooks, 840 S.W.2d 317, 327-28 (Tenn. 1992).

When there is a Rule 5(a) violation, the "unreasonable delay" is but one factor to be taken into account in evaluating the voluntariness of the confession; and if the totality of the surrounding circumstances indicates that a confession was voluntarily given, it shall not be excluded from evidence solely because of the delay

in carrying the defendant before a magistrate. State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996); State v. Readus, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988). In determining voluntariness the court should consider the defendant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the defendant before the magistrate prior to the confession; the defendant's intoxication or ill health at the time the confession was given; deprivation of food, sleep or medical attention; any physical abuse; and threats of abuse. State v. Huddleston, 924 S.W.2d at 671. Applying these factors, we find the confession was voluntarily given.

At the time of his confession the defendant was 28 years of age and had a high school education. He had no prior involvement with the police. Although the defendant had declined to make statements on most occasions prior to his confession, his confession was not the result of repeated and prolonged interrogation. He had requested to speak with the sheriff at approximately 8:00 p.m., signed a written waiver at 9:19 p.m. and signed his sworn statement at 9:38 p.m. In addition to receiving the Miranda rights just prior to the confession, defendant had been given the Miranda rights on prior occasions. There is no showing the defendant did not understand these rights. The period of time between the issuance of the arrest warrant and the confession consisted of approximately three (3) days. The defendant was not intoxicated at the time of the confession, nor was he under the influence of any drugs.

Defendant had been treated for depression prior to the homicides and had taken medication. Although he had not taken this medication during the three (3) days prior to the confession, there is no proof that the medication was purposefully withheld. Nor has there been an appropriate showing that the defendant was not competent to give the statement. There was no proof that the defendant had been deprived of food, sleep or any other medical attention. The defendant was not physically abused nor threatened with abuse.

In summary, the evidence indicates that the defendant knowingly and voluntarily waived his rights and gave his statement. Under the totality of the circumstances, we cannot conclude that the unnecessary delay in bringing the defendant before the magistrate rendered the defendant's signed statement to have been given involuntarily.

This issue is without merit.

## CONCLUSION

The evidence presented by the state was sufficient to support the jury's finding that the defendant was guilty of two (2) counts of premeditated first degree murder. Furthermore, the trial court did not err in denying defendant's motion to suppress his statement to law enforcement authorities. Accordingly, the judgment of the trial court is affirmed.

_____
**JOE G. RILEY, JUDGE**

**CONCUR:**

_____
**PAUL G. SUMMERS, JUDGE**

_____
**DAVID H. WELLES, JUDGE**

14